# EXHIBIT D

Case 1:25-cv-00002-JPW   Document 7-5   Filed 02/04/25   Page 2 of 8

In re Diisocyanates Antitrust Litigation, Not Reported in Fed. Supp. (2020)

2020 WL 7427040
Only the Westlaw citation is currently available.
United States District Court, W.D. Pennsylvania.

IN RE: DIISOCYANATES ANTITRUST LITIGATION
This Document Relates to: All Cases
Master Docket Misc. No. 18-1001
|
MDL No. 2862
|
Filed 12/18/2020

**OPINION AND ORDER OF COURT**

AMBROSE, United States Senior District Judge

**\*1** This multi-district litigation stems from an alleged conspiracy to reduce supply and increase price for methylene diphenyl diisocyanate ("MDI") and toluene diisocyanate ("TDI"), precursor ingredients for the manufacture of polyurethane foam and thermoplastic polyurethanes.[1] At the outset, I note that the parties to this action have worked cooperatively to keep this MDL moving forward and I commend them for their ability to resolve most issues. Understandably, there are and will be times when the parties reach an impasse. This is one of those times.

Plaintiffs have filed a Motion to Compel Defendants to Produce Documents and Structured Data along with related documents pursuant to Rule 37(a)(3)(B) of the Federal Rules of Civil Procedure. (ECF Nos. 395, 397, 399). The issues therein relate to the time period for discovery and the scope of the products Defendants should include in their search for and production of documents. To that end, Plaintiffs seek an order compelling: 1) Defendants to search for and produce documents from January 1, 2014 to December 31, 2019, 2) Defendants to search for and produce documents related to MDI and TDI systems and polyols, and 3) Domestic Defendants to search for and produce structured data related to MDI and TDI systems. (ECF No. 395). Domestic Defendants, as the only Defendants engaged in merits discovery at this time, have filed a Memorandum in Opposition thereto along with related documents. (ECF Nos. 415, 416). Plaintiffs filed a Reply. (ECF No. 423). The Motion is now ripe for review.[2]

**I. ANALYSIS**

Federal Rule of Civil Procedure 37 governs motions to compel discovery, which directs that the scope and limits of discovery are defined by Rule 26(b)(1) of the Federal Rules of Civil Procedure. Rule 26(b)(1) provides, in relevant part: "Parties may obtain discovery regarding any nonprivileged **matter that is relevant to any party's claim or defense <u>and</u> proportional to the needs of the case**."[3] (Emphasis added). The scope of discovery is broad, but it is not unlimited. *See,* FRCP 26(b)(2). The 2015 Amendments to Rule 26(b)(1) were designed to restore proportionality factors into the consideration of defining discovery. *Id.* at 2015 Advisory Committee Notes. "The court may limit discovery to ensure its scope is proportional to the needs of a case...." *Democratic Nat'l Comm. v. Republican Nat'l Comm.*, No. 18-1215, 2019 WL 117555, at \*2 (3d Cir. Jan.

Case 1:25-cv-00002-JPW    Document 7-5    Filed 02/04/25    Page 3 of 8

In re Diisocyanates Antitrust Litigation, Not Reported in Fed. Supp. (2020)

7, 2019). The determination of the limits of discovery is within the sound discretion of the court and is a case-specific determination. *Id.* Accordingly, a court may limit relevant discovery if it is not proportional to the needs of the case. F.R.C.P. 26(b)(1).

**2** The burden of establishing the relevance of discovery sought rests with the moving party.

> When deciding a motion to compel, "[t]he moving party bears the initial burden to prove that the requested discovery falls within the scope of discovery as defined by Rule 26(b)(1). If the moving party meets this initial burden, the burden then shifts to the opposing party to demonstrate that the requested discovery (i) does not fall within the scope of discovery contemplated by Rule 26(b)(1), or (ii) is not sufficiently relevant to justify the burden of producing the information."
> *Atkinson v. Luitpold Pharms., Inc.*, 414 F. Supp. 3d 742, 744 (E.D. Pa. 2019) (quoting *Wright v. City of Philadelphia*, 2017 WL 1541516, at *1 (E.D. Pa. Apr. 28, 2017)).

*Plump v. La Salle Univ.*, No. 19-CV-4579, 2020 WL 3250532, at *2 (E.D. Pa. June 15, 2020). "The parties and the court have the collective responsibility to consider the proportionality of all discovery and consider it in resolving discovery disputes." F.R.C.P. 26(b)(1), 2015 Advisory Committee Notes. With that in mind, I turn now to the issues at hand.

### A. Relevant Time Period

Plaintiffs argue the relevant and proportional time period for unstructured document discovery is January 1, 2014 through December 31, 2019.[4] (ECF No. 395, No. 399, p. 8). To that end, Plaintiffs assert that the start date is appropriate because suspicious supply interruptions and plant shutdowns started in 2015. (ECF No. 395, p. 10, n.7). Specifically, Plaintiffs submit that "[d]iscovery from at least two years prior to the conspiracy is relevant to understanding the market conditions leading up to the conspiracy, uncovering motives and incentives for conspiring, establishing 'but for' prices and supply, and discovering conduct evidencing Defendants' planning and initiation of the conspiracy." (ECF No. 399, p. 13). They suggest the end date is appropriate because the conspiracy is "ongoing," and, at a minimum, their proposed end date of December 31, 2019 would "provide a baseline for post-conspiracy conduct, communications, and pricing, enabling Plaintiffs to compare that to conditions and events during the conspiracy." *Id.* pp. 13-15.

Domestic Defendants make clear that, after negotiations with Plaintiffs, they have agreed to produce structured data[5] from January 1, 2013 to December 31, 2019. (ECF No. 415, p. 7). As to unstructured historical discovery, however, Domestic Defendants argue that the relevant time period should be January 1, 2015 (one year prior to the Class Period alleged in the SAC) through June 28, 2018 (the date the first underlying complaint was filed). They suggest that the more limited three-and-a-half-year time period is proportional because the SAC alleges a conspiracy beginning in 2016 and does not allege any facts of a conspiracy after 2018. (ECF No. 415, pp. 24-25). Moreover, Defendants assert that expanding discovery beyond 2018 compounds their burden exponentially. *Id.* at p. 25.

**3** In evaluating proportionality of this requested time period, to the extent relevant, I consider the "issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." F.R.C.P. 26(b)(1). As I pointed out, the issue of the relevant time period relates only to unstructured document discovery. This case was initiated in 2018. The SAC alleges a conspiracy "during the period from at least January 1, 2016 through the present." (SAC, ¶3). In one footnote, Plaintiffs suggest a Class Period that begins on January 1, 2016, but allude to needing discovery for 2015. *Id.* at n.2. There is no mention of 2014. Based on the same, I find a start date for unstructured document discovery of January 1, 2015 would sufficiently provide Plaintiffs with relevant market conditions as well as motives and incentives for conspiring and evidence of planning and initiation that is proportionate to this litigation.

As to the end date, the SAC suggests that price increases are "ongoing" and persist "to this day." (SAC, ¶¶3, 104, 161). Obviously there must be an end date for discovery and the SAC allegations do not provide a clear demarcation. Upon review, I find Defendants' proposed end date is a bit too limiting. Plaintiffs' suggestion of an end date of December 31, 2019 provides a sufficient end date without overreaching or placing an undue burden on Defendants. Accordingly, I find December 31, 2019 to be proportional in this case.

Case 1:25-cv-00002-JPW     Document 7-5     Filed 02/04/25     Page 4 of 8

In re Diisocyanates Antitrust Litigation, Not Reported in Fed. Supp. (2020)

Therefore, I find the relevant and proportional time period for unstructured discovery is January 1, 2015 through December 31, 2019. Again, this relates only to unstructured discovery as Domestic Defendants have agreed to produce structured data from January 1, 2013 to December 31, 2019. (ECF No. 415, p. 7).

### B. Scope of the Products

In a nutshell, Plaintiffs assert that, in responding to Plaintiffs' First Set of Request for Production of Documents and Second Set of Requests for Production of Documents relating to structured data, the term "Class Products" should be defined to include polyurethane ("PU") Systems[6] and that, in responding to Plaintiffs' First Set of Requests for Production of Documents, the term "Relevant Products" for discovery purposes should be defined to include polyols.[7] (ECF No. 395-1, p. 1 and No. 399-8). Defendants, on the other hand, submit that the terms "Class Products" and "Relevant Products" refer to MDIs and TDIs alone. (ECF No. 415, p. 7). In determining the scope of the products, it bears repeating that: "Parties may obtain discovery regarding any nonprivileged **matter that is relevant to any party's claim or defense and proportional to the needs of the case**." F.R.C.P. 26(b)(1) (emphasis added).

1. *Class Products*

As to the term "Class Products," Plaintiffs specifically assert that the SAC refers to a conspiracy to fix prices of "MDI and TDI products," which Plaintiffs argue includes PU Systems. (ECF No. 399, p. 10). In other words, Plaintiffs seem to be suggesting that the SAC alleges a conspiracy to fix prices of PU Systems too. A review of the SAC,[8] however, reveals otherwise.

**\*4** To begin with, this MDL is referred to as *In Re: Diisocyanates Antitrust Litigation*, not *In Re: PU Systems Antitrust Litigation*. The SAC asserts that it brings the action on behalf all entities in the United States who purchased MDI products and/or TDI products. (SAC ¶44). Thus, the crux of the litigation is whether there was a conspiracy to reduce supply and increase price for MDI and/or TDI products, not PU Systems.

Moreover, the SAC was filed by highly experienced counsel in this field.[9] The SAC delineates how MDI and TDI products are made from primary raw materials.[10] The SAC then, very specifically, defines the terms.

> 61. The term "MDI Products", as used in this CAC, refers to MDIs manufactured and/or sold by the Defendants in this case.
>
> 62. The term "TDI Products", as used in this CAC, refers to TDIs manufactured and/or sold by the Defendants in this case.

(SAC ¶¶61-62).[11] The SAC is very careful not to define MDI and/or TDI products as systems or polyols, which it easily could have given that the SAC specifically differentiates how MDIs and TDIs are made, used in combination with other chemicals (such as polyols), and what the main applications include. (SAC ¶¶54-62). As such, MDI and TDI products are part of the chemical building blocks eventually used in a myriad of polyurethane end products. In contrast to MDI or TDI products, as defined in the SAC, a PU System combines MDI or TDI with a polyol, a chemical they react with to form polyurethane. (ECF No. 399, p. 10; SAC ¶¶54-56).

Furthermore, in support of their allegations of price fixing of MDI and TDI, the SAC sets forth pricing trends of MDI and TDI, not Systems or polyols. *See, e.g.* ECF No. 377, ¶¶104-109, 122-123, Therefore, I find that, as defined by Plaintiffs in the SAC, "MDI Products" and "TDI Products" are stand alone and do not include PU Systems or polyols.[12]

Even if PU Systems are not MDI and/or TDI products (as defined in the SAC), Plaintiffs suggest that searching for and producing structured data discovery on PU Systems is still warranted because: "(1) "data about Defendants' PU systems sales are directly relevant to Plaintiffs' damages analysis; and (2) the additional burden of producing structured data on PU systems products is *de minimis*." (ECF No. 399, p. 18). In other words, Plaintiffs argue that the information is needed to create an econometric model to quantify impact and damages and that searching for and producing such discovery is as simple as "re-running" searches they have already run for MDI and TDI. *Id.* at 18-19. Additionally, Plaintiffs submit that if MDI and

Case 1:25-cv-00002-JPW    Document 7-5    Filed 02/04/25    Page 5 of 8

In re Diisocyanates Antitrust Litigation, Not Reported in Fed. Supp. (2020)

TDI prices were inflated, "then it stands to reason that the overcharge would find its way into any product" that contained MDI and TDI making PU Systems discovery relevant. (ECF No. 399, p. 16).

**\*5** Plaintiffs further suggest that such discovery is appropriate because all of the proportionality factors weigh strongly in their favor. (ECF No. 399, pp. 22-26). Specifically, Plaintiffs argue the discovery of PU Systems is proportionate because 1) antitrust cases always raise matters of public importance, 2) the amount in controversy is in the millions of dollars, 3) Defendants are in the best position to provide the documents, 4) the documents are crucial to providing a holistic understanding of the conspiracy, and 5) Defendants have failed to articulate any undue burden. *Id.*

Upon review, I disagree. While it may be true that overage charges may find their way into the vast array of end polyurethane products so as to bring such products within the realm of "relevance," it stretches the limits of relevance as PU Systems are not part of the claims of the SAC. Additionally, MDI and TDI specific documents should adequately yield the information sought and would be specific to the claims set forth in the SAC making such information regarding PU Systems discovery more attenuated. Further, Plaintiffs do not define PU Systems, meaning Plaintiffs potentially are seeking everything downstream in the polyurethane industry. And while some Defendants may sell PU Systems, it does not mean that they are within the claims asserted in the SAC.

Moreover, as Defendants point out, searching for and producing any and all documents related to PU Systems untethered to MDI and TDI is not as simple as Plaintiffs suggest. (ECF No. 415, pp. 22-23). Rather, according to Defendants the "collection, review, production, and analysis [would include] millions of additional, irrelevant pages – the most labor-intensive aspect of discovery, no matter the technology involved." *Id.* at p. 22. It is not just a re-run, but a search for new and different items (PU Systems), not to mention the translation of foreign language documents. There is no doubt that such a document search would exponentially increase the burden on Defendants. I find such burdens on Defendants outweigh any benefits.

Furthermore, while the amount in controversy is high, I do not find that any other proportionality factors set forth in Rule 26(b)(1) weigh in favor of permitting the requested discovery.

Discovery must be relevant to the claims <u>and</u> proportional to the needs of the case. This is a case about a conspiracy to fix prices of MDI and TDI. Including PU Systems in the definition of "Class Products" is not within the claims asserted in the SAC and the sweeping amount of discovery sought by Plaintiffs goes too far astray of the claims in this case. Having also considered all of the proportionality factors set forth in Rule 26(b)(1), I find that such discovery is overly broad and vague, unduly burdensome, and is not proportionate. Therefore, Plaintiffs' Motion is denied such that the term "Class Products" does not include PU Systems.

2. ***Relevant Products***
As to the term "Relevant Products," Plaintiffs acknowledge that the SAC does not specifically encompass polyols. (ECF No. 399, p. 10). In fact, the SAC specifically lays out the differences between the chemicals of diisocyanates (MDI and TDI) and polyols. (SAC, ¶¶ 54-62). Thus, just as Systems are chemically and commercially distinct from MDI and TDI products, so too are polyols.

Nonetheless, Plaintiffs assert that polyols are relevant to understanding price movements of isocyanate products such that they should be included in the discovery of relevant products because the market for polyols is closely linked to the market for diisocyanates, as the two chemicals combined to make polyurethanes.[13] (ECF No. 399, pp. 10, 21). Additionally, Plaintiffs assert polyols are relevant as PU System components.[14] *Id.* at p. 21. As a result, Plaintiffs are asking that Defendants search for and produce all documents relating to polyols.

**\*6** Upon review, I disagree. Documents related to polyols that do not discuss or have any reference to MDI or TDI are not part of the claims in the SAC. Similar to the discussion above about PU Systems, MDI and TDI specific documents should adequately yield the information sought and would be specific to the claims set forth in the SAC making such information regarding polyols more attenuated. There is no doubt that such a document search would exponentially increase the burden on Defendants. Consequently, I find such burdens on Defendants outweigh any benefits. Furthermore, I do not find any other proportionality factors set forth in Rule 26(b)(1) weigh in favor of permitting the requested discovery.

Case 1:25-cv-00002-JPW     Document 7-5     Filed 02/04/25     Page 6 of 8

In re Diisocyanates Antitrust Litigation, Not Reported in Fed. Supp. (2020)

Discovery must be relevant to the claims and proportional to the needs of the case. Again, this is a case about a conspiracy to fix prices of MDI and TDI. Including polyols in the definition of "Relevant Products" is not within the claims asserted in the SAC and is tangential to the claims in this case. Thus, I find that such discovery is overly broad, unduly burdensome, and is not proportionate. Therefore, Plaintiffs' Motion is denied such that the term "Relevant Products" does not include to polyols.

THEREFORE, this 18th day of December, 2020, upon consideration of Plaintiffs' Motion to Compel Defendants to Produce Documents and Structured Data (ECF No. 395), it is ORDERED that said Motion to Compel (ECF No. 395), is granted in part and denied in part as follows:

    1. The relevant and proportional time period for unstructured discovery is January 1, 2015 through December 31, 2019; and

    2. The Motion is denied in all other respects.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 7427040

Footnotes

[1]    Unless otherwise noted, the facts are taken from the Consolidated Second Amended Class-Action Complaint ("SAC"). (ECF No. 377).

[2]    All documents filed under seal and related hereto have been reviewed.

[3]    Rule 26(b) provides as follows:

    (b) Discovery Scope and Limits.

    (1) *Scope in General.* Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

[4]    Plaintiffs' Briefs and proposed order cite to an end date of December 31, 2019. *See,* ECF No. 395-1, p. 1, No. 399, pp. 8, 15 and No. 423, p. 6. At the status conference on November 19, 2020, Plaintiffs cited to the December 31, 2020 end date. Yet, in their Reply Brief, filed on November 2020, a day later, Plaintiffs again use the end date of 2019. (ECF No. 423, pp. 5, 6).

[5]    Structured data includes transactional items such as pricing, cost factors and margins. (ECF No. 399, p. 9; No. 415, p. 7).

[6]    PU Systems are those that combine MDI or TDI with a polyol, a chemical they react with to form polyurethane. (ECF No. 399, p. 10; SAC ¶¶54-56). According to Defendants, "Systems" do not include "blends" which are defined in the industry as mixtures of various grades of MDI or TDI. (ECF No. 415, p. 8, n.4). As such, it is worthy to note that Defendants have agreed to the discovery of blends.

Case 1:25-cv-00002-JPW   Document 7-5   Filed 02/04/25   Page 7 of 8

In re Diisocyanates Antitrust Litigation, Not Reported in Fed. Supp. (2020)

7   According to Plaintiffs, "[p]olyols are the class of chemicals that react with MDI and TDI to create polyurethane products. *Only polyols* can perform this function." (ECF No. 399, p. 21).

8   The focus is on the relevant claims and defense. F.R.C.P. 26(b)(1). The SAC claims relate to a conspiracy to reduce supply and increase price for MDI and TDI as precursor ingredients for the manufacture of polyurethanes. As a result, the relevant inquiry is how Plaintiffs define "MDI and TDI products" in the SAC, not how Defendants define them in marketing materials.

9   Plaintiffs' lead co-counsel, Jason Hartley, was co-lead counsel in the *In re: Urethane Antitrust Litig* No. 2:04-md-01616 (D. Kan. April 18, 2006). (ECF No. 81, p. 1). *In re: Urethane* involved alleged price fixing of "certain urethane products (generally known as MDI, TDI, other polyether polyols, and systems based on those products)." *In re Urethane Antitrust Litig.*, 913 F.Supp.2d 1145, 1149 (D. Kan. 2012).

10  This chart shows how MDI is manufactured. (SAC ¶58). There is a similar chart for TDI. (SAC ¶60).



Case 1:25-cv-00002-JPW   Document 7-5   Filed 02/04/25   Page 8 of 8

**In re Diisocyanates Antitrust Litigation, Not Reported in Fed. Supp. (2020)**

11      Additionally, the SAC specifically defines diisocyanates and differentiates them from polyols and polyurethane products. (SAC ¶¶ 54-62).

12      In fact, in a previous filing, Plaintiffs describe this action succinctly: "Plaintiffs' claims in this action relate solely to their purchases of MDI and TDI." (ECF No. 349, p. 5).

13      To the extent documents regarding polyols fall within the scope of discovery of MDI and TDI, Defendants have agreed to produce the same. (ECF No. 415, p. 8).

14      Defendants point out, however, there are "many other chemicals that combined with MDI and TDI to create Systems - none of which are alleged to be part a target of the conspiracy" in the SAC. (ECF No. 415, p. 20).

**End of Document**      © 2025 Thomson Reuters. No claim to original U.S. Government Works.