Mantha v. Quotewizard.com, LLC, Not Reported in Fed. Supp. (2021)
2021 WL 6061919

Case 1:25-cv-00002-JPW    Document 16-8    Filed 03/05/25    Page 1 of 9

🚩 **KeyCite Yellow Flag - Negative Treatment**
Distinguished by Hulce v. Zipongo, Inc., E.D.Wis., March 18, 2024

2021 WL 6061919
Only the Westlaw citation is currently available.
United States District Court, D. Massachusetts.

Joseph MANTHA, on behalf of himself
and all others similarly situated, Plaintiff,
v.
QUOTEWIZARD.COM, LLC, Defendant.

CIVIL ACTION NO. 19-12235-LTS[1]
|
Signed 12/03/2021
|
Filed 12/13/2021

**Attorneys and Law Firms**

Anthony I. Paronich, Paronich Law, P.C., Hingham, MA, Matthew P. McCue, Law Office of Matthew P. McCue, Natick, MA, Alex M. Washkowitz, CW Law Group, P.C., Framingham, MA, Edward A. Broderick, Broderick Law, P.C., Boston, MA, for Plaintiff.

Christine Kingston, Kevin P. Polansky, Nelson Mullins Riley & Scarborough LLP, Boston, MA, for Defendant.

**REPORT AND RECOMMENDATION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

KELLEY, U.S.M.J.

I. Introduction.

**\*1** Plaintiff Joseph Mantha brings this class action lawsuit against defendant Quotewizard.com LLC, alleging violations of the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227. The TCPA prohibits telephone solicitation to a "residential telephone subscriber who has registered his or her telephone number on the national do-not call registry ..." 47 C.F.R. § 64.1200(c)(2). Plaintiff's claim arises in connection with text messages that defendant sent to his and other putative class members' telephone numbers, which are listed on the federal do not call (DNC) registry. (#80.)[2] Currently before the court is defendant's motion for summary judgment and plaintiff's cross-motion for partial summary judgment.

(## 201, 205.) For the reasons set out below, the court recommends that defendant's motion for summary judgment be denied and plaintiff's motion for partial summary judgment be allowed.

II. Factual Background.

The facts below are undisputed unless otherwise indicated.[3]

Plaintiff has a cellular number subscribed to in his name and billed to his home address. (#225 ¶¶ 28-29.) The number is part of a service plan which includes his wife's cellular number. *Id.* ¶ 93. On November 7, 2008, plaintiff listed his cellular number on the national DNC registry. *Id.* ¶ 30. The number is not subscribed to by his employer or by any business, nor does plaintiff include the number on his business card. *Id.* ¶¶ 89-90. Plaintiff does not declare the number as a business expense on his tax return. *Id.* ¶ 92. He uses the number for personal purposes but also uses it to make and receive phone calls in connection with his work and is sometimes "on call" for his job during non-work hours. *Id.* ¶¶ 27, 94-95. As a result, his employer reimburses him for a portion of his cellular service bill each month. *Id.* ¶ 97.

Defendant generates leads, or contact information for potential customers, to insurance companies but does not itself sell insurance. (#220-1 ¶¶ 144-145.)[4] Defendant is paid for each lead it transmits to a client, such as GEICO, and the client then provides an insurance quote to the lead. *Id.* ¶ 145; #211-2 at 2-3 (copy of contract between defendant and GEICO). Clients pay defendant regardless of whether the lead ultimately purchases insurance from them. (#220-1 ¶ 146.)

Defendant bought plaintiff's lead from RevPoint Media LLC (RevPoint) on August 5, 2019. (##225 ¶¶ 49, 53; 220-1 ¶ 95.) RevPoint, in turn, had purchased plaintiffs contact information from Plural Marketing Group (Plural) earlier that same day. (##225 ¶ 54; 220-1 ¶ 101.) Plural was also not the source of plaintiff's information, but instead purchased it from a company based in Bosnia called Fenix Media (Fenix). (#225 ¶ 55.) Each lead that defendant purchased from RevPoint contained a contractual promise that leads were interested in insurance and [Redacted] to contact by defendant or others as [Redacted] (##211-1 at 9; 220-1 ¶¶ 83-86.) Plural likewise promised RevPoint that its leads were TCPA-compliant, and Fenix made the same promise to Plural. (#220-1 ¶¶ 105, 111.) Yet RevPoint has no independent way of verifying the information it purchases from Plural. (#225 ¶ 54.)

Case 1:25-cv-00002-JPW    Document 16-8    Filed 03/05/25    Page 2 of 9

Mantha v. Quotewizard.com, LLC, Not Reported in Fed. Supp. (2021)
2021 WL 6061919

**\*2** Plaintiff began receiving automated text messages from defendant on August 9, 2019. (#225 ¶¶ 4, 32.)[5] The first text stated, "I'm Amanda with QuoteWizard messaging you about your car insurance coverage. Did you still need help? We can go over the choices once you get time to spare!" *Id.* ¶ 33. He received three text messages from defendant that day. *Id.* ¶¶ 35, 37. Several days later, on August 12, 2019, defendant sent plaintiff a fourth text message: "It's Amanda! Insurance quotes that fit your requirements are closer than you think, Joe, Let's get in touch and go over everything." *Id.* ¶ 39. Later that day. defendant sent plaintiff another, similar message. *Id.* ¶ 41. The following day, plaintiff received a sixth text, again asking him to reach out to discuss auto insurance quotes. *Id.* ¶ 43. Defendant sent a seventh text that same day, reiterating the same message. *Id.* ¶ 45. Plaintiff received an eighth text on August 19, 2019, again mentioning auto insurance quotes and noting, "[w]e are just a quick call away." *Id.* ¶ 47. He responded to the texts that same day and set up a call. *Id.* ¶ 48; #220-1 ¶¶ 116-117. At no time during receipt of these text messages did plaintiff ask defendant to stop contacting him, though his number was listed on the DNC registry when he received the messages. (#220-1 ¶ 118.)

According to RevPoint's records, plaintiff consented to receive texts from defendant after he visited a website called Snappy Auto Insurance (Snappy Auto). (#225 ¶ 50.) Plaintiff, however, denies having visited the Snappy Auto website prior to receiving the text messages from defendant and denies giving defendant consent to contact him in any way, though he was unable to produce his browser history for the relevant time period. *Id.* ¶ 52. An individual named Adam Brown owned the Snappy Auto website but had stopped operating it in 2015 and had therefore ceased using it to generate leads. *Id.* ¶¶ 56-58.[6] He stated that he had never heard of Plural or Fenix, nor could he find any documentation confirming a relationship between Snappy Auto, defendant, or Fenix. *Id.* ¶¶ 59, 61. He further said that he did not know why the Snappy Auto site had been identified as being the source of plaintiff's information. *Id.* ¶¶ 59-60. When Brown had operated the Snappy Auto website, he had collected only ZIP codes and e-mail addresses, so that at no time would he have had access to plaintiff's telephone number. *Id.* ¶ 62; #210-17 at 24 (Brown deposition transcript).

In response to this litigation, defendant compiled information from RevPoint with other information relevant to plaintiff, including two IP addresses purportedly associated with plaintiff and language from the Snappy Auto website regarding site visitors' consent to contact. (#225 ¶¶ 50-51, 70-71.) That information included an identification number called a "Jornaya LeadiD" number. *Id.* ¶ 63. Jornaya is a lead verification company, and their lead identification numbers are intended to "check" whether a lead has consented to contact. *Id.* ¶¶ 64-65. A Jornaya representative testified at deposition that the LeadiD number purportedly assigned to plaintiff was not connected with the Snappy Auto website or plaintiff. *Id.* ¶¶ 67-68. Plural confirmed that the LeadiD was incorrectly associated with plaintiff through its own error. *Id.* ¶ 68.

In addition to the incorrect LeadiD number, defendant also identified two IP addresses that were purportedly associated with plaintiff. (#225 ¶¶ 70-71.) Through discovery, the parties learned that both IP addresses were associated with two other individuals who have no connection to plaintiff. *Id.* ¶¶ 72-76. The individuals who were assigned and/or had access to those IP addresses confirmed that they had never visited the Snappy Auto website. *Id.* ¶¶ 74, 76.

**\*3** The Snappy Auto website contained a consent form with a disclosure indicating that by clicking on a specific link, a site visitor was consenting to being contacted by "AutoInsurQuotes.com and one or more of its marketing partners." (#225 ¶ 77.)[7] Defendant's 30(b)(6) deponent, Matthew Weeks, testified that he did not know whether defendant was a marketing partner of AutoInsurQuotes.com, but that he was not aware of any affiliation or relation between defendant and AutoInsurQuotes.com. *Id.* ¶¶ 80-81 (citing #210-11 at 33-34 (deposition transcript).[8] He also stated that he had never heard of the website and did not know who owns or controls the site. (#210-11 at 33-34.) The consent form also provides a telephone number which consumers can purportedly use to rescind their consent to contact, though the number belongs to an entity who has indicated it has no connection to Snappy Auto, Brown, Plural, or Fenix. (#225 ¶ 84.)

Prior to plaintiff's receipt of defendant's text messages, plaintiff learned that his friend had sent a demand letter in connection with an unrelated, alleged TCPA violation. (#220-1 ¶¶ 78-81.) The friend gave plaintiff advice regarding how to handle unsolicited calls. *Id.* ¶ 82. When plaintiff told his friend about defendant's messages, the friend confirmed with his attorney that text messages "count" under the TCPA. *Id.* ¶¶ 123-124. The friend then gave plaintiff his attorney's contact information. *Id.* ¶ 125. On September 4, 2019, plaintiff served a demand letter on defendant. *Id.* ¶ 128.

Case 1:25-cv-00002-JPW    Document 16-8    Filed 03/05/25    Page 3 of 9

Mantha v. Quotewizard.com, LLC, Not Reported in Fed. Supp. (2021)
2021 WL 6061919

III. Legal Standard.

The purpose of summary judgment is "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Tobin v. Federal Express Corp.*, 775 F.3d 448, 450 (1st Cir. 2014) (internal citation and quotations marks omitted). "[A] court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is inappropriate "if the record is sufficiently open-ended to permit a rational fact finder to resolve a material factual dispute in favor of either side." *Pierce v. Cotuit Fire Dist.*, 741 F.3d 295, 301 (1st Cir. 2014).

The moving party bears the initial burden of asserting the absence of a genuine issue of material fact and "support[ing] that assertion by affidavits, admissions, or other materials of evidentiary quality." *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003) (citation omitted). A genuine issue of fact exists where a fact finder could find in favor of the non-moving party, "while material facts are those whose existence or nonexistence has the potential to change the outcome of the suit." *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 38 (1st Cir. 2014) (internal citation and quotations marks omitted). "Once the moving party avers the absence of genuine issues of material fact, the nonmovant must show that a factual dispute does exist, but summary judgment cannot be defeated by relying on improbable inferences, conclusory allegations, or rank speculation." *Fontanez-Nuñez v. Janssen Ortho LLC*, 447 F.3d 50, 54-55 (1st Cir. 2006) (internal citation and quotation marks omitted).

In determining whether summary judgment is proper, the court must view the record in the light most favorable to the non-moving party and must draw all reasonable inferences in the non-movant's favor. *Ahmed v. Johnson*, 752 F.3d 490, 495 (1st Cir. 2014). "Where, as here, the parties cross-move for summary judgment, the court must assay each motion 'separately, drawing inferences against each movant in turn.' " *Lawless v. Steward Health Care Sys., LLC*, 894 F.3d 9, 21 (1st Cir. 2018) (quoting *EEOC v. Steamship Clerks Union*, 48 F.3d 594, 603 n.8 (1st Cir. 1995)). "Cross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Adria Int'l Grp., Inc. v. Ferré Dev., Inc.*, 241 F.3d 103, 107 (1st Cir. 2001). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

IV. Discussion.

*4 Defendant moves for summary judgment, raising five grounds for the entry of judgment in its favor. (#201.) Plaintiff's cross-motion for partial summary judgment asks the court to determine two issues that overlap with the grounds defendant raises. (#205.)

A. Whether DNC Protection Applies to Cellular Telephone Numbers.

Defendant first argues that the TCPA's DNC protection does not apply to cellular telephone numbers, (#202 at 8), while plaintiff counters that, per FCC regulation, this protection has been extended to cellular numbers. (#221-2 at 3-4.)

In interpreting the TCPA, the FCC has expressed its view that the DNC provision applies to cellular numbers. *In re Rules & Regs. Implementing the TCPA of 1991* (*In re Rules* 2003), 18 FCC Rcd. 14014, ¶ 36 (June 26, 2003) ("[W]e believe it is more consistent with the overall intent of the TCPA to allow wireless subscribers to benefit from the full range of TCPA protections.... Therefore, we conclude that wireless subscribers may participate in the national do-not-call list."). As a result, FCC regulations interpreting the TCPA extend DNC protection to cellular phones. 42 C.F.R. § 64.1200(c)(2), (e) ("No person or entity shall initiate any telephone solicitation to ... [a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry .... The rules set forth ... are applicable to any person or entity making telephone solicitations or telemarketing calls to wireless telephone numbers ....").

Consistent with FCC regulations, courts within this district have repeatedly found that the TCPA's DNC provision applies to cellular numbers registered to a residential (non-business) user. *See, e.g.*, *Barton v. Temescal Wellness, LLC*, 525 F. Supp. 3d 195, 202 (D. Mass. 2021); *Rosenberg v. LoanDepot.com LLC*, 435 F. Supp. 3d 308, 324 (D. Mass. 2020); Report and Recommendation at 10-11, *Scanlon v. Manscaped, LLC*, No. 20-cv-10795 (Dec. 14, 2020), ECF No. 26 (report and recommendation adopted at ECF No. 27). The court recommends applying these interpretations of the TCPA to find that its DNC provisions apply to cellular numbers.[9]

B. <u>Whether Plaintiff Was a Residential Subscriber</u>.
Defendant next argues that because plaintiff used his cellular number for both personal and business purposes, it was not a residential line and therefore should not be afforded protection under the TCPA. (#202 at 12-13.) Plaintiff cross-moves for summary judgment on this issue, contending that he was a residential subscriber because his cellular number was registered to him as an individual, was billed to his home address, and was paid for as part of a family plan. (#221-2 at 7-8, 10; #209 at 22.)

Calls and texts to numbers listed on the DNC registry violate the TCPA. 47 C.F.R. § 1200(c)(2). However, the TCPA's DNC registry protects residential numbers only, not numbers associated with a business. *Id.* (defining DNC protections in relation to "residential telephone subscriber[s]"). The FCC "presumes that wireless subscribers who ask to be put on the National Do Not Call Registry are residential subscribers." *Barton*, 525 F. Supp. 3d at 202.[10] "[B]ecause the TCPA is a consumer protection statute, [courts] must interpret it broadly in favor of consumers." *Breda v. Cellco P'ship*, 934 F.3d 1, 10 (1st Cir. 2019).

**\*5** Defendant argues that a residential number and a number used for personal purposes are not equivalent under the TCPA and its regulations, and that DNC protection is limited to phones used in a residential context. (#230 at 3-4.) Yet by extending DNC protection to cellular numbers, which are inherently mobile and not limited to use in the home, it is reasonable to interpret the TCPA and its relevant regulations as extending DNC protection to cellular numbers that are not used exclusively in the home. *See In re Rules* 2003 ¶ 36 ("[A]lthough Congress expressed concern with residential privacy, it also was concerned with the nuisance, expense and burden that telephone solicitations place on consumers."); *id.* (separate statement of FCC Chairman Michael K. Powell) (noting that the FCC's revised rules "make[ ] the American consumer's toolbox more complete by creating a national do not call list and strengthening and modifying our other longstanding protections under the TCPA. Our goal: to maximize consumers' ability to control the messages they receive on their *personal phones* and faxes." (emphasis added)); *see also McEwen v. NRA of Am.*, No. 2:20-cv-00153, 2021 WL 1414273 at \*6, 2021 U.S. Dist. LEXIS 72133 at \*16 (D. Me. Apr. 14, 2021) ("[T]he FCC has extended its do-not-call regulations *to encompass both residential land lines and personal cellphones*." (emphasis added)).

The parties do not dispute that plaintiff's cellular number was registered in his name or that the service plan for that number was billed to his home address. His number was not issued by his employer nor was it in his employer's name. Having considered both motions separately as they relate to this issue, the court recommends granting summary judgment in favor of plaintiff by finding that DNC protection applied to his number because he was a residential subscriber. *See Scott*, 550 U.S. at 380, 127 S.Ct. 1769.

C. <u>Whether Plaintiff Has Standing</u>.
Defendant claims that plaintiff lacks standing because "he attempted to manufacture liability" with the goal of pursuing a TCPA claim and therefore was not truly harmed by defendant's conduct. (#202 at 17-19.) Plaintiff maintains that he was indeed harmed by defendant and that his injuries are within the scope of those contemplated by Congress in enacting the TCPA. (#221-2 at 18.)

Under Article III, "the 'irreducible constitutional minimum' of standing consists of three elements. The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 136 S. Ct. 1540, 1547, 194 L.Ed.2d 635 (2016) (citation omitted). "Article III standing requires a concrete injury even in the context of a statutory violation." *Id.* at 1549. "Although tangible injuries are perhaps easier to recognize," the Supreme Court has "confirmed in many of [its] previous cases that intangible injuries can nevertheless be concrete." *Id.*

> In addition to these Article III prerequisites, prudential concerns ordinarily require a plaintiff to show that his claim is premised on his own legal rights (as opposed to those of a third party), that his claim is not merely a generalized grievance, and that it falls within the zone of interests protected by the law invoked.

*Pagan v. Calderon*, 448 F.3d 16, 27 (1st Cir. 2006). "These prudential considerations, though important, are not as inexorable as their Article III counterparts." *Id.*

In his complaint, plaintiff alleges that defendant's repeated text messages violated his privacy and were "an annoying, harassing nuisance." (#80 ¶ 58.) In a declaration submitted in support of his motion for partial summary judgment, plaintiff stated that he finds unsolicited telemarketing irritating and a violation of his privacy rights, and that he listed his number on the DNC registry to alert potential callers to his desire to

Case 1:25-cv-00002-JPW    Document 16-8    Filed 03/05/25    Page 5 of 9

Mantha v. Quotewizard.com, LLC, Not Reported in Fed. Supp. (2021)
2021 WL 6061919

avoid such calls. (#210-14 ¶¶ 9-10.) In addition, in response to an interrogatory request from defendant, plaintiff further stated that he communicated his frustration with defendant's messages to a friend. (#210-6 at 4.)[11] In *Gibbs v. SolarCity Corp.*, a plaintiff whose number was on the DNC list alleged harassment due to unsolicited calls. 239 F. Supp. 3d 391, 395 (D. Mass. 2017). There, the court noted that "[t]he majority of courts considering similar facts have found them sufficient to satisfy the requirement of concrete injury, and several have held that a mere technical violation of the TCPA is, by itself, a concrete injury sufficient to confer standing." *Id.*

**\*6** As in *Gibbs*, which was also decided at summary judgment, the court recommends a determination that comports "with the majority of courts finding that Congress, when it enacted the TCPA, recognized receiving unsolicited telemarketing calls is a legally cognizable harm and comprises a 'concrete' injury." *Id.* at 395-396. Further, the court recommends finding that plaintiff passes the prudential hurdle because he alleged a particularized harm caused by what he describes as defendant's unsolicited texts. This alleged harm falls within the zone of interests protected by the TCPA and its DNC list. See *Pagan*, 448 F.3d at 27.

As an additional attack on plaintiff's standing, defendant suggests that plaintiff "set [it] up for liability" with the intention of securing damages through a TCPA suit. (#202 at 17.) But defendant also admits that unlike professional plaintiffs who have been found to lack standing in other TCPA cases, this is plaintiff's first TCPA case. *Id.*; *see Stoops v. Wells Fargo Bank, N.A.*, 197 F. Supp. 3d 782, 800-802 (W.D. Pa. 2016) (granting summary judgment and finding that plaintiff lacked Article III and prudential standing where she admitted to buying thirty-five cellular phones in order to receive telemarketing calls and initiate TCPA litigation as a business venture).

The court further recommends finding that defendant's allegations regarding plaintiff's interest in pursuing this litigation does not, on these facts, limit plaintiff's standing. See *Katz v. Liberty Power Corp., LLC*, No. 18-cv-10506, 2019 WL 4645524, at \*10, 2019 U.S. Dist. LEXIS 162793, at \*34 (D. Mass. Sep. 24, 2019) (denying summary judgment and finding standing where defendant alleged that plaintiff was a "professional plaintiff" because court found that plaintiff used phone for purposes beyond litigation and alleged annoyance and harassment through defendant's repeated calls). "The fact that [plaintiff] may now, or might someday, be pleased that he received incessant calls from [defendant] or its agents because of the financial reward this lawsuit could bring does not, by itself, deprive him of standing." *Id.* at \*10, 2019 U.S. Dist. LEXIS 162793, at \*32.

D. <u>Whether Defendant's Text Messages Were Soliciting a Transaction/Whether Plaintiff Consented to Contact</u>.
Next, defendant contends that plaintiff requested the quotes it was attempting to provide via text message, thereby consenting to contact such that its communications were not prohibited solicitations subject to TCPA restriction. (#202 at 21.) Defendant's contention goes to the question of consent; plaintiff moves for partial summary judgment on that question. (#209 at 20-22.)

1. <u>Whether Plaintiff Visited the Snappy Auto Website</u>.

The court first addresses whether plaintiff visited the Snappy Auto website, as defendant argues that, through allegedly visiting the site and completing the consent form, plaintiff consented to contact. (##202 at 21-22; 223 at 2.)

Plaintiff has presented evidence showing that the two IP addresses that RevPoint associated with him were not, in fact, his. Defendant claims that testimony from its witnesses indicated that the IP addresses *could* have come from servers for the Snappy Auto website. See #225 ¶ 50 (citing testimony regarding possible sources of the IP addresses). It is clear, however, that they did not. Instead, the addresses were from two random individuals who had no connection to plaintiff and who had never visited the Snappy Auto site. There is therefore no evidence linking a computer connected to plaintiff to the website.[12]

**\*7** In addition, Jornaya confirmed that the LeadiD RevPoint identified as linking plaintiff to the Snappy Auto website had no connection to him. This is supported by Plural's admission that it assigned the LeadiD to plaintiff's data in error. Finally, the Snappy Auto site had been dormant since 2015, when the domain owner, Brown, stopped operating it. If Fenix, the Bosnian company that now claims to be the site's webmaster, was operating the site without Brown's knowledge (as defendant admits is possible), then Fenix was pirating the site and as such was not a reliable source for TCPA-compliant leads.

Absent any evidence that plaintiff visited the website, the court recommends concluding that no reasonable jury could find that he did so.

2. Whether Defendant's Text Messages Were Soliciting a Transaction.

A conclusion that plaintiff did not visit the Snappy Auto website necessitates a finding that defendant's communications were solicitations.

A telephone solicitation is defined as

> the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person, but such term does not include a call or message (A) to any person with that person's prior express invitation or permission, [or] (B) to any person with whom the caller has an established business relationship ....

47 U.S.C. § 227(a)(4).

Because plaintiff did not visit the Snappy Auto website, he therefore did not request the insurance quotes defendant was offering. Thus, defendant initiated contact with plaintiff. That contact was intended to share insurance quotes (i.e. purchase prices) for the purpose of encouraging a purchase of services—insurance coverage—from clients such as GEICO. The definition of telephone solicitation does not require the party initiating contact to be directly offering a sale, rather "referring a consumer to another entity is a prohibited purpose if the purpose of the referral is to encourage a purchase, even if a purchase from another entity or a future purchase." *Panacci v. A1 Solar Power, Inc.*, No. 15-cv-00532, 2015 WL 3750112, at *6, 2015 U.S. Dist. LEXIS 77294, at *16 (N.D. Cal. June 15, 2015). The court therefore recommends concluding that defendant's communications were solicitations within the meaning of the regulations.

3. Whether Consent Form Was TCPA Compliant.

Even if plaintiff had visited the Snappy Auto website, plaintiff argues that the consent form defendant identified as giving it consent to contact plaintiff was insufficient to provide TCPA-compliant consent. (#209 at 20-21.) Defendant contends that the form was sufficient. (#223 at 7-9.)

FCC regulations prohibit contacting a telephone number listed on the DNC registry unless the telephone subscriber has given prior consent to contact via a signed, written agreement:

> No person or entity shall initiate any telephone solicitation to ... [a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry .... Any person or entity making telephone solicitations (or on whose behalf telephone solicitations are made) will not be liable for violating this requirement if: ... [i]t has obtained the subscriber's prior express invitation or permission. Such permission must be evidenced by a signed, written agreement between the consumer and seller which states that the consumer agrees to be contacted by this seller and includes the telephone number to which the calls may be placed ....

47 C.F.R. § 64.1200(c)(2)(ii).

Prior express consent

> means an agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered.

**\*8** *Id.* § 64.1200(f)(9). "The term seller means the person or entity on whose behalf a telephone call or message is initiated for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." *Id.* § 64.1200(f)(10).

"In a TCPA claim, whether or not express consent is given is not an element of the claim, but is instead 'an affirmative defense for which the defendant bears the burden of proof.'" *Lamont v. Furniture N., LLC*, No. 14-cv-036, 2014 WL 1453750, at *2, 2014 U.S. Dist. LEXIS 51927, at *5 (D.N.H. Apr. 15, 2014) (quoting *Himes v. Client Servs. Inc.*, 990 F. Supp. 2d 59, 69 (D.N.H. 2014)); *see also In re Rules & Regulations Implementing the TCPA of 1991*, 27 FCC Rcd 1830, ¶ 33 (*In re Rules* 2012) (Feb. 15, 2012) ("[S]hould any question about the consent arise, the seller will bear the burden of demonstrating that a clear and conspicuous disclosure was provided and that unambiguous consent was obtained.").

Both parties discuss the question of prior written consent by assuming that defendant qualifies as a seller under the applicable regulation, therefore the court analyzes the issue by

applying the same assumption. *See* ##223 at 6-9 (defendant's brief, asserting that it had prior written consent under § 64.1200(c)(2)(ii)); 209 at 17 (plaintiff's brief, describing defendant as a seller that needed to obtain prior written consent); 202 at 26 n.9 (defendant's brief, describing consent received from plaintiff in context of consent provided to a seller).

The consent form that defendant claims supplied plaintiff's consent was not TCPA-compliant. First, the form does not mention defendant or its clients by name. Defendant cites its 30(b)(6) deponent's statement that the phrase "marketing partners" on that form referred to defendant, but that is contradicted by his further testimony that defendant does not have a contract with the company (AutoInsurQuotes.com) named in the consent form and that he—as defendant's senior manager of data partnerships—had never heard of the company. The form also contained a telephone number for an entity that was not associated with Snappy Auto, AutoInsurQuotes.com, or defendant. *See* 47 C.F.R. § 64.1200(c)(2)(ii) (stating that prior express consent "must be evidenced by a signed, written agreement *between the consumer and seller*" (emphasis added)); *Mattson v. New Penn Fin.*, No. 3:18-cv-00990, 2020 WL 6270907 at *4, 2020 U.S. Dist. LEXIS 197955 at *12 (D. Or. Oct. 25, 2020) ("[T]he regulations promulgated under the TCPA require the consumer's prior express consent to receive calls from the *specific* telemarketer that makes the call before the telemarketer can call a number listed on the DNCR." (emphasis added) (citing 47 C.F.R. § 64.1200(c)(2)(ii))).

Second, as Plaintiff notes, to be TCPA compliant, a consumer's consent to receive solicitations from a seller must comply with the E-SIGN Act. (#234-1 at 4 n.4.) This is consistent with TCPA regulations, which allow an electronic signature in connection with prior written consent if it complies with the requirements under the E-SIGN Act. 47 C.F.R. § 64.1200(f)(9) (defining prior express written consent and requirements for electronic signatures); *see In re Rules* 2012 ¶ 34 ("[C]onsent obtained in compliance with the E-SIGN Act will satisfy the requirements of our revised rule, including permission obtained via an email, website form, text message, telephone keypress, or voice recording."). The E-SIGN Act provides that an electronic record may be used to provide information to a consumer that is required to be made in writing per a statute or regulation where the consumer is provided with certain disclosures, including how to withdraw consent. 15 U.S.C. § 7001(c). Those disclosures were not included in the consent form defendant identified.

**\*9** Accordingly, even assuming plaintiff had visited the website, no reasonable jury would credit defendant's claim to be a "marketing partner" with the company listed on the consent form. Nor would a jury be able to find plaintiff's consent valid where the disclosure on the consent form did not contain those required under 15 U.S.C. § 7001(c) and 47 C.F.R. § 64.1200(f)(9). *Contra Winner v. Kohl's Dep't Stores, Inc.*, No. 16-cv-1541, 2017 WL 3535038, at *8–9, 2017 U.S. Dist. LEXIS 131225, at *21 (E.D. Pa. Aug. 17, 2017) (finding valid consent where plaintiff was notified of right to withdraw consent and the procedures to do so, consistent with 15 U.S.C. § 7001(c)).[13] The court recommends finding that, even if plaintiff visited the Snappy Auto website, any consent provided was invalid.

4. Contractual Promises Regarding TCPA Compliance.

Defendant asks the court to consider the fact that each entity to sell plaintiff's contact information provided a contractual promise of TCPA compliance. (#223 at 17-18.) Again, given that the source of plaintiff's contact information, Fenix, appears to have pirated the Snappy Auto website in order to either generate leads or falsify the source of leads, the promise of TCPA compliance it made to Plural, which Plural in turn made to RevPoint, and which RevPoint ultimately made to defendant is not dispositive on the question of TCPA compliance. In addition, RevPoint acknowledged that it had no independent means of verifying the TCPA-compliance of its data. Citing a contractual promise of compliance as evidence of compliance is a conclusory allegation that is insufficient to defeat summary judgment. *See Fontanez-Nuñez*, 447 F.3d at 54-55.

5. Summary.

The evidence is strongly in plaintiff's favor on the question of consent such that there is no genuine dispute. *See Miranda-Rivera v. Toledo-Dávila*, 813 F.3d 64, 69 (1st Cir. 2016) ("A 'genuine' dispute exists when a jury can reasonably interpret the evidence in the non-movant's favor."); *Lucoff v. Navient Sol., LLC*, 981 F.3d 1299, 1306 (11th Cir. 2020) ("TCPA consent issues are appropriate for summary judgment ... when the underlying facts are not disputed."). Even drawing all reasonable inferences in defendant's favor

on the issue of consent, defendant has failed to meet its burden of showing that plaintiff visited the Snappy Auto website or, in the alternative, that plaintiff visited the site and provided valid consent, therefore the court recommends granting summary judgment to plaintiff on this issue. See [Scott, 550 U.S. at 380, 127 S.Ct. 1769](). As a result, the court likewise recommends denying defendant's motion for summary judgment as to whether its messages to plaintiff were consented-to solicitations. See [Lawless, 894 F.3d at 21]().

### E. Whether Defendant Relied in Good Faith on Leads It Purchased.

Defendant asks the court to recognize a good faith defense should it find that plaintiff did not consent to being contacted by defendant. (#202 at 26.) As grounds for this request, defendant notes that it believed the data it purchased from RevPoint was TCPA-compliant because RevPoint was contractually obligated to provide such data. *Id.*

As plaintiff notes, courts have roundly rejected a good faith defense to TCPA violations, though such a defense may be relevant in the context of damages for willfulness. (#221-2 at 27-28 (collecting cases).)[14] Furthermore, defendant's request poses public policy concerns. If defendant were relieved of liability, there would be no incentive for defendant to ensure that its data suppliers hold to their contractual obligations to provide TCPA-compliant data. Correspondingly, data suppliers would have no incentive to ensure that their data was, in fact, compliant.[15]

**\*10** The court recommends that a good faith reliance defense should not be recognized as relieving defendant from liability for contacting plaintiff in violation of the TCPA.

### V. Conclusion.

For the foregoing reasons, it is RECOMMENDED that the court:

1. DENY defendant's motion for summary judgment (#201).

2. ALLOW plaintiff's motion for partial summary judgment (#205).

### VI. Review by District Judge.

The parties are hereby advised that any party who objects to this report and recommendation must file written objections thereto with the Clerk of this Court within fourteen days of service of this report and recommendation. The written objections must specifically identify the portion of this report and recommendation to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with [Fed. R. Civ. P. 72(b)]() shall preclude further appellate review. *See* [Keating v. Sec'y of Health & Human Servs., 848 F.2d 271 (1st Cir. 1988)](); [U.S. v. Emiliano Valencia-Copete, 792 F.2d 4 (1st Cir. 1986)](); [Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983)](); [U.S. v. Vega, 678 F.2d 376, 378–79 (1st Cir. 1982)](); [Park Manor Mart, Inc. v. Ford Motor Co., 616 F.2d 603 (1st Cir. 1980)](); *see also* [Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985)]().

**All Citations**

Not Reported in Fed. Supp., 2021 WL 6061919

---

Footnotes

1    This case has been referred to the undersigned for full pretrial case management, including all dispositive motions. (#76.)

2    Count I of plaintiff's first amended complaint, alleging defendant's violation of the TCPA's automated calling provisions, was dismissed with prejudice by stipulation of the parties. (#187.)

3    The facts are drawn from plaintiff's response to defendant's statement of facts (#220-1) and defendant's response to plaintiff's statement of facts (#225).

4    Leads include a party's contact information and their purported consent to be contacted, along with the seller's contractual guarantee that the party did, in fact, consent to contact pursuant to the TCPA. (#225 ¶ 53.)

5    Defendant and Drips, LLC (Drips) are the assignees to an agreement by which Drips sends automated marketing messages to consumers nationwide on defendant's behalf. (#225 ¶ 3.) [Redacted] *Id.* ¶ 9.

Case 1:25-cv-00002-JPW   Document 16-8   Filed 03/05/25   Page 9 of 9

Mantha v. Quotewizard.com, LLC, Not Reported in Fed. Supp. (2021)
2021 WL 6061919

| | |
|---|---|
| 6 | Defendant cites an e-mail from someone associated with Fenix in Bosnia who claims to be the Snappy Auto "webmaster." *See* #225 ¶ 58. Yet Brown, who owns the Snappy Auto website, testified at his deposition that he had never heard of that person and that he had not been operating the website since 2015. *Id.* ¶¶ 58-59; #210-17 at 38 (Brown deposition transcript). Therefore, if the website was still active in 2019, then as defendant acknowledges, Fenix was operating the site without Brown's permission. *See* #225 ¶ 58. The e-mail defendant references is the subject of a motion to strike on the grounds that it is hearsay evidence. (#219.) |
| 7 | Defendant obtained this information from the Snappy Auto website after plaintiff initiated litigation and RevPoint identified the website as the source for plaintiff's lead. (#225 ¶ 77.) |
| 8 | Weeks is defendant's senior manager of data partnerships. (#210-11 at 6:3-4.) |
| 9 | Although defendant has not raised this issue, the court notes that "[t]he TCPA ... applies to other forms of communication, such as text messages." *Breda v. Cellco P'ship*, 934 F.3d 1, 13 n.1 (1st Cir. 2019) (citing *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 136 S. Ct. 663, 667, 193 L.Ed.2d 571 (2016)); *see Barton*, 525 F. Supp. 3d at 198 ("The overwhelming weight of precedent holds that text messages are calls for the purposes of the TCPA."). |
| 10 | Defendant cites the FCC's statement that "[s]uch a presumption ... may require a complaining wireless subscriber to provide further proof of the validity of that presumption should we need to take enforcement action." *In re Rules* 2003 ¶ 36. The court notes, however, that this statement uses "may" to indicate possibility rather than a definite course of action, and refers to FCC enforcement actions, not private litigation. |
| 11 | Defendant suggests that because plaintiff responded to the eighth text it sent, plaintiff was not harmed by the messages. (#230 at 11 (claiming that "Mantha literally created the circumstances he now complains about" by responding to defendant's messages).) Yet contact after eight messages in a row does not negate plaintiff's allegation that the first eight messages were a nuisance. |
| 12 | Defendant notes that plaintiff was unable to provide his browser history for the relevant time period and asks the court to draw an adverse inference that plaintiff deleted his browser history to hide evidence of having visited the Snappy Auto site. (#223 at 19.) Even if the court were to draw an adverse inference, as discussed below, the remaining evidence regarding Snappy Auto's problematic consent form supports a finding that even if plaintiff did visit the website and fill out the form, he did not consent to contact by defendant. |
| 13 | As an additional point, defendant argues that because plaintiff responded after receiving eight text messages, he was consenting to contact. (#202 at 28.) That may be true for texts plaintiff received after he responded, but not for the eight he received prior to responding. |
| 14 | Defendant cites *Sandoe v. Bos. Sci. Corp.*, No. 18-cv-11826, 2020 WL 94064, 2020 U.S. Dist. LEXIS 2800 (D. Mass. Jan. 8, 2020), in support of its proposed defense. (#202 at 26.) That case, however, involved a defendant who had received consent to contact a party regarding medical treatment at a telephone number that was later reassigned. *Sandoe*, 2020 WL 94064, at *——, 2020 U.S. Dist. LEXIS 2800, at *4. The court observed that "the text of the TCPA does not recognize a reasonable reliance defense." *Id.* at *4, 2020 U.S. Dist. LEXIS 2800, at *11. Ultimately, however, the court determined that defendant could not have known that the number had been reassigned when it attempted to reach the party who had originally consented to contact, and that it was unclear what else the defendant could have done to discover the change. *Id.* at *——, 2020 U.S. Dist. LEXIS 2800, at *14. *Sandoe* involved different facts (including, for example, a defendant who had not contracted for the contact information at issue) and is therefore inapposite to this case. |
| 15 | Defendant's complaint that being held liable for violating the TCPA where it relied on data it purchased from others would be to "require the impossible" is not persuasive. *See* (#202 at 28.) |

**End of Document**                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.